## WINTER *et al. v.* SOUTHERN SECURITIES CO. *et al.*

1. A bona fide stockholder has the legal right to inspect the books and records of the company, where the examination is asked for in good faith for a specific and honest purpose, and not to gratify curiosity, or for speculating or for vexatious purposes; and provided further that the purpose of the stockholder desiring to make the examination is germane to his interest as a stockholder, proper and lawful in character, and not inimical to the interests of the corporation itself, and the inspection is made during reasonable business hours. 14 C. J.

855; 7 R. C. L. 322, § 298 et seq.; Cook on Corporations (7th ed.), § 511; Thompson on Corporations (2d ed.), § 4515. There is no allegation in the present case that the petitioners were induced to purchase stock in the Southern Securities Company by reason of fraudulent acts of the officers and directors of the corporation.

2. The petitioning minority stockholders having the right to inspect the books and records, including the minutes of the directors' meetings, for the purposes and under the circumstances named in the preceding headnote, and none of the acts of the officers and directors complained of having been committed since June, 1910, and the petition in the case having been filed in the year 1922, the court properly sustained that ground of the demurrer based on laches. The delay on the part of the petitioners for such length of time was unreasonable.

3. No law of this State prohibits a private corporation from purchasing and holding stock in other corporations, except that embraced in article 4, section 2, paragraph 4, of the constitution of Georgia, which prohibits the granting of power to a corporation to purchase stock in another corporation when the purchase may have or be intended to have the effect of defeating or lessening competition or encouraging monoply. The purchase of the stock of the insurance company by the securities company, therefore, was not contrary to law. None of the acts of the officers and directors of the securities company, as alleged in the petition with reference to the conduct of its business, are sufficient to constitute fraudulent or ultra vires acts. Whether such acts are wise and beneficial to the company whose business they were conducting is not a matter which concerns the court. Independently, therefore, of the question of laches, the court did not err in sustaining the demurrer and dismissing the petition on the ground that the allegations of the petition did not authorize a court of equity to take charge, through a receiver, of the assets of the defendants.

4. On review of the case of *Alexander* v. *Searcy*, 81 *Ga.* 536 (8 S. E. 630, 12 Am. St. R. 337), this court declines to overrule that decision.

No. 3526. MAY 16, 1923.

Equitable petition. Before Judge Ellis. Fulton superior court. October 28, 1922.

Error is assigned upon the judgment of the superior court sustaining a general demurrer and dismissing the equitable petition filed by Annie Lou Winter and H. M. Dodd, in behalf of themselves and others similarly situated, against Southern Securities Company, Wilmer L. Moore, John E. Murphey, J. H. Williams, Mell R. Wilkinson, Lewis H. Beck, Robert F. Moore, and Southern States Life Insurance Company. As amended the petition, in so far as material, alleged substantially the following: Petitioners are the owners of fifty and twenty-seven shares, respectively, of stock in the Southern Securities Company, for which they paid full value. On March 29, 1906, a charter was

granted by Fulton superior court to the Southern Securities Company conferring upon it the right "to buy, sell, hold and own, in any lawful manner, bonds, stocks, debentures and securities of all kinds, and also to buy and sell the same on commission; to buy, sell, hold, own, mortgage or encumber property, both real and personal, to borrow or lend money, and give and take proper security therefor, and to do such other and further acts not inconsistent with the laws of this State to further carry out and promote the interest of said company." The capital stock of the Southern Securities Company was fixed originally at $150,000. Organization of that company was perfected on April 3, 1906, by acceptance of the charter, election of directors, etc. On the same date, as shown by the corporate minutes of the Securities Company, "the president was authorized to appoint one or more interested parties to secure a charter for the Southern States Life Insurance Company in Montgomery, Alabama, with power to proceed with the organization of said company as the laws of the State of Alabama might require, and to subscribe, for the Securities Company, to the total issue of the stock of the said Southern States Life Insurance Company at $150.00 per share, except so much of said stock as was necessary to be held by other parties to organize the company." At this meeting the Securities Company "was authorized to enter into a contract with a company known as the General Agencies Company." On April 16, 1906, the $150,000 realized from the sale of the original issue of capital stock of the Securities Company" was employed . . . in the purchase of all the stock of the Southern States Life Insurance Company." By action of the board of directors of the Securities Company had on May 16, 1906, its capital stock was increased from $150,000 to $499,500. Stock representing this increase was issued and sold from time to time. The par value of the increase in stock was $349,500, but it was sold at a premium and realized the aggregate sum of $367,000. The last sale of this increased issue of stock was finally consummated on June 6, 1910. Winter purchased her stock in the Securities Company through a broker on Jan. 26, 1910. Twenty of the shares held by Dodd were originally purchased by one Kemp from the Securities Company on July 19, 1909, and were sold by his administrator to Rountree, from whom Dodd purchased on December 5, 1921.

The other seven shares owned by Dodd were purchased on November 19, 1921, from Mary P. Orme, who had acquired the same from the estate of Frank Orme, who obtained the same under his subscription of May 9, 1906, to the original issue of $150,000 of the capital stock.

The original instrument of subscription to the stock of the Securities Company stipulated that the Insurance Company would be organized with a capital stock of $100,000, and a surplus of $50,000; that the Securities Company would subscribe for all the stock, except such shares as might be required to qualify directors, at $150 per share, and also "provided for the organization of an agency company to make a contract with the Life Insurance Company to pay all of the Life Insurance Company's expenses of every kind, . . which agency company was to also make a contract with the Securities Company to pay the Securities Company an annuity of $12.50 on each $100.00 of stock in the Securities Company which should be issued to the Agency Company." This arrangement with the Agency Company was "to continue for a period of ten years after the Insurance Company began business." This instrument was signed by a number of subscribers to the capital stock of the Securities Company, whose subscriptions aggregated $150,000 in par value; but the only shares owned by either of petitioners which ever at any time belonged to any person signing said instrument are the seven shares purchased by Dodd from Mary P. Orme, and which were originally subscribed for by Frank Orme. Pursuant to the arrangement above mentioned contracts were entered into between the Securities Company and the Agency Company and between the Insurance Company and the Agency Company. About a year later these contracts were abrogated, and the Securities Company purchased all of the capital stock of the Agency Company, "its contracts, assets, and good will," and agreed to assume its liabilities. The consideration paid by the Securities Company to the Agency Company was 2500 shares of the capital stock of the Securities Company. As a part of this plan the Securities Company undertook to relieve the Insurance Company from liability under its contract with the Agency Company, and it was provided that the Insurance Company "would cover the liability due by it under said contract with the Agencies Company by issuing to the

38

Southern Securities Company expense-loading certificates to bear 8% interest, payable semi-annually; the principal to be paid in fifteen (15) equal annual payments, and the certificates to be a lien upon the expense loadings of the Insurance Company, payable only out of such expense loadings, the Life Insurance Company to be in no otherwise liable thereon;" the Securities Company to increase its capital stock sufficiently to meet the future operating expenses of the Insurance Company not provided for by the preliminary term-policy contracts, and should lend to the Insurance Company the proceeds derived from the sale of such stock and should receive therefor " expense-loading certificates " as described above. This arrangement was carried out as follows: All the stock of the Securities Company held by the Agencies Company under the original arrangement for the payment by the latter to the former of annuities upon said stock, was returned to the Securities Company; the Securities Company issued to the Agencies Company 2500 shares of its capital stock; the Insurance Company issued to the Securities Company its " expense-loading " certificates as described above, to cover this 2500 shares of stock; [neither the value of the stock nor the amount for which certificates were issued is stated]. The remaining shares of, the increase in the capital stock of the Securities Company were sold by it, the proceeds of each sale, as made, being turned over to the Insurance Company, for which it issued to the Securities Company " expense-loading certificates."

On December 29, 1909, the board of directors of the Securities Company, at a regular meeting, provided for the surrender of the " expense-loading " certificates which had been taken in the form above described, and that in place of the certificates surrendered, and for moneys advanced in the future, " expense-loading " certificates should be taken in the following form:

." For value received the Southern States Life Insurance Company promises to pay to the Southern Securities Company at its home office in Atlanta, Ga.; the sum of; . . . . with interest thereon from date at the rate of eight per cent (8%) per annum, both principal sum and interest being payable only out of the expense loadings received by the Insurance Company at such time or times and in such amounts as the Board of Directors of The Southern States Life Insurance Company shall

determine. Provided, however, and same is accepted by the Southern Securities Company upon the express condition, that this obligation shall not be construed as a liability against said The Southern States Life Insurance Company, the intent hereof being only to stipulate the sum or sums received by The Southern States Life Insurance Company from The Southern Securities Company to meet the expenses of The Southern States Life Insurance Company, which said sum or sums, together with interest thereon, as above stipulated, shall become a charge against the expense loadings upon premiums of insurance collected by the said The Southern States Life Insurance Company, and payable to the Southern Securities Company at such time and in such amounts as the Directors of The Southern States Life Insurance Company shall deem expedient. In witness whereof, The Southern States Life Insurance Company has caused its corporate name to be signed and its official seal to be affixed by Wilmer L. Moore, its President, and Robert F. Moore, its Secretary."

In addition to the facts above recited the petition alleged: The Board of Directors of the Securities Company and of the Insurance Company are, and have been since said corporations were organized, composed of practically the same persons; all of the individuals named as defendants "have been, and are each and all, directors of" both corporations "and are officers of said companies, as follows: Wilmer L. Moore is president of both of said companies, and the active executive head of each. John E. Murphey is vice-president of the Southern Securities Company. Mell R. Wilkinson and Lewis H. Beck are vice-presidents of the Southern States Life Insurance Company, and Robert F. Moore is secretary of said Life Insurance Company. J. H. Williams is auditor of the Life Insurance Company and secretary and treasurer of the Securities Company. The Securities Company was chartered by Fulton superior court, and "under the laws of Georgia had, and could have, no power, right, or authority to conduct or operate a foreign insurance company, that is to say, an insurance company chartered by another State or county." It was never contemplated by the charter granted the Southern Securities Company that it should invest all of its capital stock in the stock of an insurance company, or that it should operate and conduct such a company; the charter of said Securities Company con-

templated that is should deal in stocks, bonds, and other securities, buying and selling in the market, and thus realizing a profit for its stockholders. Petitioners are advised and believe that "the substance of the agreement or arrangement made between the Insurance Company and the Securities Company, through the mutual officers of the two companies, was that the Securities Company should take and hold the entire capital stock of the Insurance Company, elect its officers, and conduct its affairs; and that the Securities Company should turn over to the Insurance Company, to be employed as operating capital, all of the moneys realized by the former from the sale of its capital stock; that the Securities Company, except it should be the sole owner of the capital stock of the Insurance Company, should have no enforceable, binding obligation, or evidence of indebtedness, of the Insurance Company, for the repayment of the large sums of money loaned to it by the Securities Company; and that said loans were never to be repaid, unless, in the arbitrary discretion of the directors of the Insurance Company, a time should arrive when the Insurance Company was inclined, or saw fit, to do so out of 'premium-expense loadings.' Such time has never arrived, and throughout all the years the Insurance Company has paid nothing to the Securities Company by way of dividends, nor on account of the interest and principal of said loans, and said Securities Company has paid no dividends to its stockholders." It was the purpose of the persons in control of the Securities Company, and especially the individuals named as defendants, to organize and conduct the Southern States Life Insurance Company, and "to misappropriate and divert the assets of said Securities Company to this end, . . in order to capitalize the latter company and to organize the same, and to conduct an insurance company, all of which was illegal and in violation of the charter powers of the Southern Securities Company, and . . a misappropriation and misuse of the assets of said company." The funds turned over by the Securities Company to the Insurance Company had from the beginning constituted all of the assets and working capital of the Insurance Company; the use of these assets and moneys of the Securities Company in this way was clearly in violation of the duty which the managing officers, directors and stockholders of said Securities Company owed to petitioners and others similarly situated.

For the $550,000.00 or other large sum advanced by the Securities Company it has no security except the capital stock of the Insurance Company of the par value of $150,000 (the petition elsewhere alleges the par value to be only $100,000).

The Securities Company has "no bonds, stocks, or other collateral, and no notes or other proper obligation from said Life Insurance Company to pay the $400,000 or other large sum." The Insurance Company does not carry on its books as a liability, or report as such to the Insurance Department of this State or other States, any indebtedness to the Securities Company, except its stock liability to said company of $150,000. The Insurance Company, "in view of the indebtedness to said Securities Company, . . is insolvent, as shown by a recent report of said Insurance Company to the Insurance Commissioner of this State; its surplus, including capital, over liabilities, being less than $200,000, and, as above stated, it does not report or carry as a liability any obligation of indebtedness to the Securities Co. for the $400,000 or other large sum which it owes to it." In the matter of incorporation, organization, and conduct of the Securities Company petitioners relied entirely upon the good faith, ability, and judgment of those in control of said corporation. The diversion and misapplication of the moneys derived from the sale of stock was unknown to petitioners and unknown to the great bulk of the stockholders; for every action taken with reference to any of the matters and things set out, appearing upon the minutes of said corporation, was taken at directors' meetings and not stockholders' meetings, and was not communicated to petitioners or any other of the stockholders at any time or in any way, except those stockholders who were also directors of said corporation. "Until latterly they had no idea or knowledge of the fact that the Southern Securities Company was undertaking to conduct a foreign life-insurance company, in violation of its charter, or that its assets had been diverted and misapplied." "Having recently ascertained the facts" set out, petitioner Winter, through her attorney at law, at the meeting of stockholders of the Securities Company held on March 28, 1922, the first meeting of stockholders after she ascertained the facts detailed above, in writing "demanded of the Securities Co., within the corporation, at the hands of its stockholders, redress on behalf of herself and all other stock-

holders similarly situated, . . and requested appropriate action on the part of the stockholders for the purpose of recovering the assets of the Securities Co. from said Insurance Company and applying them to proper ends, . . that the stockholders adopt a resolution calling upon the directors and executive officers of the Company to take appropriate action to recover the moneys loaned out by the Company to the Southern States Life Insurance Co., . . and to take such further action as might be necessary for realizing the assets of the Securities Company, and employing and using them in accordance with the purpose of its charter terms." This meeting of stockholders " was in complete control of the individuals named as defendants." Notwithstanding this demand, petitioners are advised and believe that resolutions were passed by those in charge of the meeting, denying the redress sought, and that further application for redress to either the stockholders or directors would be futile and unavailing. Under the facts detailed " the Southern States Life Insurance Co., and the individual defendants herein named, and their associates, are, in law and in equity, trustees holding the funds of said alleged corporation, Southern Securities Co., for the benefit of the members of said corporation, including petitioners and those similarly situated;" and " they are illegally in possession of said funds, and are illegally employing and using the same." " Plaintiffs have no adequate remedy at law; and unless this court of equity and good conscience intervenes by its injunction and takes charge of the assets now in the hands of the defendants, and places them in the hands of its receiver to be administered under the orders and decrees of this court, the plaintiffs and all the stockholders similarly situated will suffer irreparable wrongs and damage."

The prayers were: (1) that each and all of the defendants be required to account for the assets of the Securities Company, and " to give a full and detailed statement and showing thereof, and that said Life Insurance Company be required to pay over to a receiver, to be named by this court, all of the moneys and assets received by it illegally, as aforesaid, from the Securities Company, or its officers, with interest thereupon, said moneys and funds and assets to be distributed by proper decree of this court;" (2) " that a receiver be appointed to take charge of the assets, funds, etc., of the alleged corporation, Southern Securities Co.,

to administer the same under the orders and decree of this court; that inasmuch as, under the facts and circumstances heretofore detailed, said Insurance Co. is insolvent and has charge of the trust funds belonging to petitioners and others similarly situated, as members of the Southern Securities Company, a receiver be appointed for said Insurance Company to take charge of all of its assets, including books of account, records, etc., collect in said assets and reduce the same to cash; and that said receiver be directed to pay over to the receiver of the assets of Southern Securities Company such amount as may be held to be due;" (3) "that all moneys paid in, or stock subscriptions for stock of . . Southern Securities Co., be declared to be a trust fund for the benefit of petitioners and others similarly situated;" (4) "that the court, through proper orders, decrees, and procedure, do trace and reclaim the assets of said Southern Securities Company illegally diverted to the Southern States Life Insurance Company;" (5) "that the interests of petitioners and all others similarly situated in the assets reclaimed and brought into court be determined, and that petitioners and others similarly situated be given judgment against each and all of the defendants for the amounts due to them respectively;" (6) for general relief, and (7) for process.

The grounds of general demurrer are: (1) The petition does not show any sum or amount or property due petitioners from the Securities Co., and does not set forth any cause of action or ground for relief, legal or equitable; (2) it appears from the pleadings that Southern Securities Company had a legal right to do all of the acts and things complained of in said petition, and that none of the same give rise to any ground for complaint on the part of the plaintiffs; (3) it does not appear that plaintiffs, as stockholders, have any right or title to maintain this action, they being minority stockholders, and the management and control of the corporation being vested in the board of directors and in the majority stockholders of the corporation, and therefore the petition does not contain any cause of action; (4) it appears from the allegations of the petition that plaintiffs are stockholders in Southern Securities Company, and that they have no right, title, or interest in or to the Southern States Life Insurance Company, and have no right to begin any proceeding against Southern States

Life Insurance Company, and are not in privity with said company, and are not entitled to call said company to account for any matter or thing contained in said petition; (5) the petition " shows on its face that the Southern Securities Company was organized for pecuniary gain and profit to its stockholders; that it had the right to buy, hold or own, in any lawful manner, stock and other things, and that it likewise had the right to borrow or lend money; and defendants say that no reason appears in said petition why, under said powers, the said Southern Securities Company could not own and hold the stock of the Southern States Life Insurance Company, and likewise no reason appears in said petition why said Southern Securities Company could not lend money to the Southern States Life Insurance Company;" (6) the petition is multifarious and contains a misjoinder of actions, in that the relief prayed for against the Southern Securities Company is separate and distinct from the relief prayed for against the Southern States Life Insurance Company, and cannot be joined in the same action; (7) that petitioners have been guilty of laches in the following respects: (a) it appears from the petition that plaintiff Winter acquired her stock on January 26, 1910, and that the other plaintiff, Dodd, and his predecessors in title, acquired their stock on July 19, 1909, and it further appears that the last sale of any of the stock of the Southern Securities Company was made on June 6, 1910, and that the proceeds of sale were immediately turned over to the Insurance Company, and that transaction occurred more than eleven years before the filing of the petition; and the action is therefore barred by lapse of time; (b) the alleged diversion and misapplication of moneys derived from the sale of stock appears from the pleadings to have appeared upon the minutes of the directors' meetings (and upon the minutes of the incorporators' meeting also), and the plaintiffs were chargeable with knowledge thereof, and were guilty of gross negligence in not acquiring such knowledge, if they did not actually have it, and, under all of the facts and circumstances alleged in the pleadings, they were guilty of such laches in failing to file this proceeding sooner as will bar the present action; (c) it appears from the petition that at the first meeting of the directors of the Southern Securities Company, held on April 3, 1906, the president was authorized to appoint one or more parties to secure

a charter for the Southern States Life Insurance Company in Montgomery, Alabama, with power to proceed with the organization of such company as the laws of Alabama might require, and to subscribe, for the Securities Company, to the total issue of the stock of the Southern States Life Insurance Company, and that said meeting so authorizing the Southern Securities Company to take the stock of the Southern States Life Insurance Company appears upon the minutes of the board of directors of said date, and in law and in equity, and by applying all of the rules of ordinary diligence, plaintiffs were chargeable with knowledge of said meeting, and of the facts transpiring at said meeting, and their action is barred by laches; (8) that no ground for receiver exists against defendant insurance company, because section 2442(g) of Park's Code (Acts 1914, p. 135) has not been complied with, in that the plaintiffs failed to make application to the Insurance Commissioner, sitting with the Governor and Attorney-General as required by law, and have a decision by said tribunal, before this bill was filed.

The judgment of the court was specifically made to relate to " the general demurrer," and the several grounds of special demurrer are therefore not stated.

*Clifford L. Anderson, Custis N. Anderson, John S. Highsmith,* and *Meyer Goldberg,* for plaintiffs.

*Reuben R. & Lowry Arnold* and *A. J. Orme,* for defendants.

GILBERT, J. 1. The principle announced in the first headnote does not require elaboration.

2. Under the allegations of the petition the proceeds arising from the sale of the original stock issued by the Securities Company had already been used by the officers and directors of that company in the purchase of the stock of the Insurance Company prior to the acquisition of any stock in the Securities Company by the petitioners in this case; and as to that transaction they have no right to complain. Also, under the allegations of the petition, the proceeds arising from the issue of the additional shares when the capital stock was increased was loaned to the insurance company as such funds were received during the period from the year 1906 to the year 1910. Part of the stock acquired by the petitioner Dodd was of the original issue. Stock of the petitioner Winter was of the new issue and acquired through a broker on

January 26, 1910, and the sale of all of the new issue of stock was completed on June 6, 1910. The petitioners, having the right to inspect the books and records of the Securities Company, had at least constructive notice, and accordingly, as matter of law, were charged with notice from June 6, 1910, but took no action until the filing of this petition in 1922. It has been held by this court: "The general rule is, that while a minority of the stockholders of a corporation may maintain a bill in equity in behalf of themselves and other stockholders for fraud, conspiracy, or acts ultra vires, against a corporation, its officers, and others who participate therein, when the minority stockholders have been injured or damaged by such acts, they must act promptly. If they postpone their complaint for an unreasonable time, they forfeit their right to equitable relief." *Alexander* v. *Searcy,* 81 *Ga.* 536 (supra); see also *Smith* v. *Coolidge Banking Co.,* 147 *Ga.* 7 (92 S. E. 519), and *Bartow Lumber Co.* v. *Enwright,* 131 *Ga.* 329 (62 S. E. 233).

In the last-cited case Mr. Justice Holden, speaking for the court, said: "The right to control the affairs of a corporation is vested by law in its stockholders — those whose pecuniary gain is dependent upon its successful management. The majority stockholders, or the majority of the directors, when directors are chosen to act on behalf of the stockholders, have the right to determine the business policy of the corporation, and the minority must submit to their judgment in such matters, when exercised in good faith and not involving acts ultra vires, or in breach of trust. As was said by this court in *Hand* v. *Dexter,* 41 *Ga.* 454, 461, 'The very foundation principle of a corporation is that the majority of its stockholders have the right to manage its affairs, so long as they keep within their charter rights.' No principle of law is more firmly fixed in our jurisprudence than the one which declares that the courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs. In 10 Cyc. 969, the rule is thus stated: 'The true distinction is between acts in excess of the powers of the directors and in breach of their trust, and acts which are within their powers and which merely involve an exercise of the discretion committed to them. The rule here is that in the absence of usurpation, of fraud, or of gross negligence, courts of equity will not interfere at the suit of a dissatisfied minority,

merely to overrule and control the discretion of the directors on questions of corporate management, policy, or business, but will allow the majority to rule, and will leave the dissatisfied minority to redress their grievances through ordinary corporate methods.' Based on decisions in consonance with the doctrine as above announced, the codifiers of the code of this State have embodied these rules of law in two sections of our Civil Code, as follows: § 1859 [Civil Code of 1910, § 2223]. 'So long as the majority stockholders confine themselves within their charter powers, a court of equity will require a strong case of mismanagement or fraud, before it will interfere in the internal management of the affairs of a corporation.' § 1860 [Civil Code of 1910, § 2224]. 'A minority stockholder may proceed in equity in behalf of himself and other stockholders for fraud, or acts ultra vires, against a corporation, its officers, and those participating therein, when he and they are injured thereby. But there must be shown — 1. Some action or threatened action of the directors beyond the charter powers; or, 2. Such a fraudulent transaction completed or threatened, among themselves or shareholders or others, as will result in serious injury to the company or other shareholders; or, 3. That a majority of the directors are acting in their own interest in a manner destructive of the company, or of the rights of other shareholders; or, 4. That the majority stockholders are oppressively and illegally pursuing, in the name of the corporation, a course in violation of the rights of the shareholders, which can only be restrained by a court of equity; and it must also appear — 5. That petitioner has acted promptly; that he made an earnest effort to obtain redress at the hands of the directors and stockholders, or why it could not be done, or it was not reasonable to require it. 6. The petitioner must show that he was a shareholder at the time of the transaction of which he complains, or that his shares have devolved upon him since by operation of law.' See also *Lamar* v. *Lanier House Co.,* 76 *Ga.* 640; *Alexander* v. *Searcy,* 81 *Ga.* 536 (8 S. E. 630); *Empire Hotel Co.* v. *Main,* 98 *Ga.* 176 (25 S. E. 413); *Gibson* v. *Thornton,* 107 *Ga.* 545 (33 S. E. 895); *Reynolds* v. *Martin,* 116 *Ga.* 503 (42 S. E. 796)."

It would serve no useful purpose should this court express an opinion upon the advisability of the corporate transactions of which

complaint is made. Whether the course of management pursued by the officers and directors of the Southern Securities Company will eventually prove to be wise or foolish, time alone will disclose. That question does not concern the court. The only question that concerns the court is whether or not the petition is subject to demurrer. One ground of the demurrer is that in equity the petitioners are barred on account of laches. As stated in the first headnote of the case of *Barlow Lumber Co.* v. *Enwright,* supra; " The internal management of a corporation will not be interfered with by the court, at the instance of a minority stockholder, unless the majority stockholders are acting without the charter powers, or a strong case of mismanagement, or fraud, is shown." And this is especially true where the complaining minority stockholders have delayed for some eleven or twelve years the bringing of their suit, as in this case. The court properly sustained the demurrer and dismissed the petition on the ground of laches.

3. The fact that the Securities Company purchased all of the stock of the Insurance Company furnishes no reason for the interference of a court of equity. In *Cox* v. *Hardee,* 135 *Ga.* 80 (68 S. E. 932), it was said: " We know of no law in this State . . which prohibits granting to private corporations power to purchase and hold stock in other corporations, except that embraced in article 4, section 2, par. 4, of the constitution, which simply prohibits the grant of power to a corporation to purchase stock in another corporation, when the purchase may have or be intended to have the effect of defeating or lessening competition or encouraging monopoly." And see *Trust Company of Georgia* v. *State,* 109 *Ga.* 736 (35 S. E. 323, 48 L. R. A. 520). The charter of this company specifically provided that it might acquire and own stock in other corporations, without placing any limit upon the amount thereof or the percentage of stock which it could acquire in any one company. The charter power is as follows: " to buy, sell, hold and own, in any lawful manner, bonds, stocks, debentures, and securities of all kinds, and also to buy and sell the same on commission; to buy, sell, hold, own, mortgage or encumber property, both real and personal, to borrow or lend money, and give or take proper security therefor, and to do such other and further acts, not inconsistent with the laws of this State, to

further carry out and promote the interest of said company." The purpose of the suit is not to enjoin a threatened or impending action; it seeks the equitable powers of the court to have a court receiver take charge of both the Insurance Company and the Securities Company, not at the instance of creditors of either company, but at the instance of minority stockholders of the latter company only. It is not alleged that the Securities Company owes any debts. Under such circumstances it must be assumed that there are no creditors. The only complaint is that by reason of the manner of conducting the business affairs of the company by its officers and directors the Securities Company has made no profits and declared no dividends since the year 1910. The trial judge was authorized to adjudge that the facts alleged in the petition did not amount to a charge of bad faith or dishonesty or fraud as to the complaining minority stockholders. The court was also authorized to find from the allegations of the petition that the charter of the Securities Company authorized the directors to purchase the entire stock in the Insurance Company and to lend it money. The failure to take security for the money loaned to it, a separate corporation, owned completely, or to all practical purposes owned, by the lending company, did not amount to an ultra vires act. The charter of the Securities Company contained the following power: " to borrow or lend money, and give or take proper security therefor." Petitioners contend that this provision of the charter authorized the lending of money only when security was taken. We do not think this a proper construction of the power given. The power given is " to borrow or lend money," also to " give or take proper security." The company was authorized to do either or both. That provision of the charter did not prohibit the company from borrowing money without giving security, or lending money without taking security, but authorized both. That was a matter left to the business discretion of the officers and directors chosen by the majority stockholders to conduct the business affairs of the company. Independently, therefore, of laches, we are of the opinion that the trial court properly refused to take equitable jurisdiction of the case, and to turn over to a court receiver the assets of going concerns, where no demands of creditors were involved, and where one of the corporations owes no debts and the

other owns assets amounting to millions, as in the case of the Insurance Company, and especially since the interests of numerous policyholders were involved. In a case like this, where the suit is by minority stockholders, interested to a comparatively small degree, every reasonable construction will be given to the allegations of the pleadings consistent with leaving the affairs of the company in the hands of those chosen by the majority stockholders.

4. We are requested to review and overrule the case of *Alexander v. Searcy*, 81 *Ga.* 536 (supra). After carefully considering and reviewing that case, we decline to overrule it. We not only think the case, as decided, is founded upon correct principles, but it has been adhered to in other cases, and the portion of it which supports this ruling has become a part of the Civil Code (1910), and is found in section 2224.

*Judgment affirmed. All the Justices concur, except Russell. C. J., dissenting, and Hill, J., disqualified.*